IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————————————————————

UNITED STATES OF AMERICA,

        v.                                             21-CR-15-JLS-JJM

NICHOLAS TURNQUIST,

                Defendant.

———————————————————————

**GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT'S SECOND MOTION FOR RELEASE**

The United States of America, through its undersigned attorneys, submits this response in opposition to Defendant's Second Motion for Release from Custody (Dkt. 30) (the "Motion"). The defendant's Motion should be denied for the following reasons.

### I.    The Defendant Again Understates The Evidence Against Him.

In his Motion, the defendant again understates the powerful evidence against him. Specifically, the defendant insists that he did not admit during the controlled phone call that he engaged in sexual activity with Victim 1 when she was underage. In fact, in the relevant portion of the call – quoted at length below – Victim 1 confronts the defendant about having sex with her when she was a kid and he expresses remorse for it:

> VICTIM 1: Okay. Well, there -- I need to talk to you, like -- like, Justin's [Victim 1's husband] starting to ask questions, like. He's -- how am I supposed to tell him that --
>
> NICHOLAS TURNQUIST: I don't know what you want me to tell you. If you want to talk, then come over, talk. If you wanted Riley to see Lyla, you can take her anytime you want.
>
> VICTIM 1: I just need to know your input here. Like, he want -- like, he wants to know if -- he knows that I did things with you, okay. Like --
>
> NICHOLAS TURNQUIST: Right.

VICTIM 1:  He wants to know if I -- how old I was, and if I was a virgin, and all this other shit.  Like, how am I supposed to explain this to him?  Like, help me.

NICHOLAS TURNQUIST:  I don't know how you're supposed to explain anything.  I -- I don't.  I -- I'm -- I feel -- this is what I'm telling you.  I still don't know how to explain shit that I've seen.  I still beat myself up over decisions that I've made as, far as shit when I was 13 and 14-years-old that fucking caused me ever to be able to be a cop.  That I sit there, and I can't get over because I -- I beat myself up going, if I had just did that differently.

VICTIM 1:  That's when you started doing stuff with me, though.

NICHOLAS TURNQUIST:  When I was 13 or 14, I didn't even know you.

VICTIM 1:  No.  You're --

NICHOLAS TURNQUIST:  I don't know what you're talking about.

VICTIM 1:  Like, you're saying you've had stuff going on since 13 and 14, so have I.

NICHOLAS TURNQUIST:  That's crap.  Like, I  -- I -- I don't know what you want me to tell you here.  Like if --

VICTIM 1:  Nick, I -- this is me and you, okay?  I don't know if you're around Carley or what, but I just -- why can't you  just talk to me one-on-one for five seconds?

NICHOLAS TURNQUIST:  I am talking to you.

VICTIM 1:  I need your help, Nick.

NICHOLAS TURNQUIST:  I'm – [Victim 1], I am talking to you.  I don't know what you want me to say to you.

VICTIM 1:  Like, it's not like I can go to a counsellor and be, like, oh, I had sex with my stepdad from, fucking, when I was a little kid to fucking –

NICHOLAS TURNQUIST:  Oh my God.  Okay.

VICTIM 1:  -- until I was 18.

NICHOLAS TURNQUIST:  And then -- and then if that's what you feel you need to do, then go ahead, because that's crap, but.

VICTIM 1:  No, it's not what I need to do.  Nick, could you shut the fuck up here?  Like, let's be serious.  I don't know what the fuck you think is going on here, but you're not bullshitting me right now.  Okay.  I'm trying to have a conversation with you one-on-one.  I don't know if it's because I'm on speaker and you're with Carley or you're next to her or what.

NICHOLAS TURNQUIST:  No, I'm in the fucking bedroom by my damn self.  I don't need this (inaudible)

VICTIM 1:  Well, what the fuck, Nick, okay?  I don't need this shit right now.

NICHOLAS TURNQUIST:  I don't either.  Like I don't know what the hell you want me to tell you.

VICTIM 1:  I want you to one-on-one --

NICHOLAS TURNQUIST:  (Inaudible) Justin come over and I'll talk to him, too.  You want to meet somewhere, I'll meet somewhere.  If you want to hang out with Riley and Lyla, then you (inaudible) discuss that with her.  I -- I -- I'm giving you options here.

VICTIM 1:  Can you at least just tell me why?

NICHOLAS TURNQUIST:  Why --

VICTIM 1:  What made you want to do something with me?

NICHOLAS TURNQUIST:  Why what?

VICTIM 1:  What made you want to do things with me?  Like, I wasn't pretty.

NICHOLAS TURNQUIST:  Because you wanted to.  Like, what -- I'm not going to sit here and keep having the discussion because I don't like the fact of any of it either, so.  It is not something that I'm exactly fucking  comfortable with.  Do you think, like, what I  -- I sit there and love that, or -- or -- fucking what?  No.

VICTIM 1:  I'm not saying you did, I just want some input here on how I'm supposed to get through it.

NICHOLAS TURNQUIST:  Well, because it was a fucking consensual thing, and it fucking happened, and unfortunately, it can't be taken back.

VICTIM 1:  Yes.

NICHOLAS TURNQUIST:  So.

VICTIM 1:  But yeah, it was --

NICHOLAS TURNQUIST:  You think that I fucking sit there and don't fucking regret very second of it?  Well, sure, but what the fuck.  I -- nothing I do or say can get rid of that.  Nothing I say or do –

VICTIM 1:  Okay.  But realizing now when I'm older, how was it consensual at the ages that I was?

NICHOLAS TURNQUIST:  Seriously?

VICTIM 1:  Yeah.  It could have been where it was whatever, but I didn't know any better.

NICHOLAS TURNQUIST:  Okay.

**VICTIM 1:  I was a kid.  Like, do you -- is that what you regret, or do you regret, like, the whole thing?  Do you regret the young part, do you regret the old part, do you regret the whole thing?  Like, all you keep saying is, oh, I regret it.**

**NICHOLAS TURNQUIST:  Yeah.**

**VICTIM 1:  Okay.  So what do you regret?**

**NICHOLAS TURNQUIST:  That it happened.**

VICTIM 1:  Wow.  Okay.  All right.

NICHOLAS TURNQUIST:  I mean, what was the point of this phone call, just to ask me that?

3

VICTIM 1:  No.  The point was for you to help me here.  But if you regretted the whole thing, then why didn't it stop?

NICHOLAS TURNQUIST:  First of all, it did. So I don't know where you're coming from.

VICTIM 1:  Yeah, when I moved.  [Victim 1 moved out when she was 18.]

NICHOLAS TURNQUIST:  I don't know half of where the hell you're coming from right now so.  (Inaudible)

VICTIM 1:  When I moved is when it stopped.  The question -- whole point of this phone call wasn't for me to find out that you regretted it.  The whole point of this phone call was for you to help me figure out how I'm supposed to fucking tell my husband all of this.

NICHOLAS TURNQUIST:  And -- and that -- that was me telling you that -- if the times that it happened, it -- I -- I regret doing it, and I have trouble myself understanding it.  How am I supposed to help you if I can't even help myself?

VICTIM 1:  I don't know, I guess.  I was hoping that I had something calling you.

NICHOLAS TURNQUIST:  Well, and I'm trying to, but you don't think that I sit there and fucking want to smash my head against the wall?  Knowing that I -- I raised you, and I -- I let things happen?  Like, no.  I feel like a fucking piece of crap, but nothing I can think of and nothing that I can do is going to change that that happened.

During the above conversation, Victim 1 becomes very emotional and is crying at several points, reflecting the trauma she suffered at the hands of the defendant.[1]

In addition to the controlled phone call, the defendant made a jail call after his arrest in which he told his wife to look up the age of consent in Pennsylvania, Ohio, Maryland, South Carolina, Florida, and Canada, *i.e.*, the places that he traveled to with Victim 1. Defendant says to his wife at one point, "let's say Pennsylvania is 15," then, according to the defendant, law enforcement cannot charge him with a crime.  This jail call corroborates the charge here, which is that the defendant took Victim 1 to Splash Lagoon in Pennsylvania and had sex with her there when she was only 16 years old.

---

[1] The government can provide a copy of the video recording of the controlled call to the Court if the Court wishes to watch it directly.

The charge in this case is further corroborated by the defendant's biological daughter identified as Minor 2. Minor 2 told the interviewers from the Child Advocacy Center that she witnessed defendant have sexual intercourse with Victim 1. She specifically recalled a trip to Pennsylvania that took place when she was five years old and in the middle of kindergarten. She recounted the defendant and Victim 1 having some clothing on but Victim 1 being on top of defendant, facing him, her legs spread over defendant, and that the two were under a blanket. Minor 2 heard Victim 1 tell defendant to stop but he told her that he was the adult and would do what he wanted.

## II.    Defendant Has Not Overcome The Presumption Set Forth In Section 3142(e)(3).

Because the defendant is charged with an offense involving a minor victim in violation of 18 U.S.C. § 2423, there is a presumption that no condition or combination of conditions will reasonably assure the defendant's future appearance in Court and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(E). The defendant bears the burden of producing evidence to rebut that presumption. *See United States v. Thompson*, 436 F. Supp.3d 631, 635 (W.D.N.Y. 2020) ("The presumption shifts to a defendant 'a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight.'" (*citing United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)).

### A.    Safety of the Community

The presumption that the defendant poses a danger to the community is well justified here. There is compelling evidence that the defendant sexually abused his stepdaughter when she was a child and *while she was in his care*. This speaks to the defendant's disregard for the

5

safety of others and his willingness to hurt the most vulnerable members of the community for his own gratification.  Furthermore, as Victim 1 testified at trial in Wyoming County, the defendant threatened Victim 1 and her mother, grandmother, and sisters with violence if Victim 1 told on him.  The defendant also repeatedly committed acts of physical violence against Victim 1 and her mom.  *See* Dkt. 19, Exhibit A, trial transcript pages 38-39, 40, 43.  Moreover, there has been an instance of witness intimidation already in this case, as the day that Victim 1 testified at trial in Wyoming County Court, the defendant's wife tried to run Victim 1 off the road.  The defendant has not offered any new facts or evidence in his Motion to rebut the presumption that he presents a danger to the community.

      **B.**    **Risk of Flight**

The defendant faces a mandatory minimum sentence of 10 years in prison if convicted and the possibility of a life sentence.  He additionally faces significant state prison time in Genesee County and Erie County.  He has an enormous incentive to flee.  Consequently, the bond that the defendant proposes is wholly insufficient.  Defendant does not offer to post any of his *own* money or property, but offers only the equity in another person's property.  There is little reason to think that the defendant – who has demonstrated a willingness to put his own interests above those of a young family member in his care – will not again put himself first.

## CONCLUSION

Defendant has failed to overcome the statutory presumption for detention. His Motion should be denied.

DATED: Buffalo, New York, September 16, 2021.

JAMES P. KENNEDY, JR.
United States Attorney

BY:    s/ PAUL E. BONANNO
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5873
Paul.Bonanno@usdoj.gov
