UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

               Plaintiff,

v.                                            Case No. 21-CR-15-JLS

NICHOLAS TURNQUIST,

               Defendant.
_____

## DEFENDANT NICHOLAS TURNQUIST'S SENTENCING MEMORANDUM



*Attorneys for Defendant Nicholas Turnquist*
Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York  14221
(716) 222-3288
rob@singerlegalpllc.com

**Introduction**

Nicholas Turnquist is a life-long Western New Yorker.  He is a high school dropout who earned his GED notwithstanding a history of learning disabilities.  He is a person who has served his community as a volunteer firefighter, EMT, and corrections officer.  He is a self-made entrepreneur who owned his own construction and medical equipment installation companies.  He is a brother and son to his siblings and parents.  He is a husband to his wife.  He is a father to his two daughters and his wife's two children.  He is a resilient man who overcame abuse as a child.  He also is a convicted sex-offender.

As set forth in greater detail below, Nicholas Turnquist made a grievous error in judgment when he chose to sexually abuse his step-daughter.  His actions will hold life-long consequences for himself, his step-daughter, and many others.  On July 6, 2022, Nick took responsibility for his actions and pleaded guilty to the crimes alleged in the indictment.  Yet, he is not the type of offender who requires commitment to prison for decades.  His acceptance of responsibility, lack of criminal history, and strong family support make that unnecessary.  For these reasons, the Court should adjudge the thirteen-year sentence to incarceration recommended by the parties in the plea agreement followed by ten-years of supervised release.

**Argument**

**A.  Who is Nicholas Turnquist?**

Nick is the son of Patti and Stuart Turnquist.  Patti and Stuart had children from different relationships, but Nick did not have a close relationship with any of them.  He did, however, have a close relationship with his younger brother, Robert.  Patti and Stuart were married until Nick was a teenager.  Stuart worked in construction.  Patti was a nurse.  The family of four lived in a modest house.

Patti loved her children and provided a stable upbringing for Nick and Rob.  Stuart was a different story.  Throughout the marriage, Stuart suffered from addiction.  His troubles with drugs led him to be verbally and physically abusive towards Patti.  When Nick and Rob grew older, Stuart directed his aggression towards the boys.  Nick tried his best to help his mother, but he was too young and diminutive to do anything.  The same was true when he tried to defend himself.  The abuse he witnessed and later suffered had lasting effects.

Patti and Stuart broke up when Nick was 14 years old.  Patti took custody of the boys and raised Nick and Rob.  Nick attended school in the East Aurora School District.  Academics did not come easy for Nick.  He suffered from ADHD and dyslexia.  As a result of these disabilities, Nick received services in school and academic accommodations.  These accommodations were designed to help, but, ironically, at the same time hurt Nick because kids considered him "different" when he left classes for services or got extra time for tests.  On top of that, Nick was small and immature for his age.  Classmates would make fun of him.  For a child who already was timid as a result of the negativity he experienced at home, this was devastating for Nick.

As an Eighth Grader, fellow classmates pressured Nick into calling in a bomb threat to school.  A lack of confidence and maturity caused Nick to succumb to peer pressure and make the call to 911.  The stunt was a sophomoric prank, yet authorities and school officials (understandably) did not see it that way.  Nick was charged with a felony in Family Court and was transferred to a BOCES school.  His case was resolved with counseling and ultimately was dismissed, but Nick suffered alienation as a result of his conduct.  The incident further alienated Nick from academics and his classmates.

In Tenth Grade, Nick had had enough with school.  Classes were too difficult.  He worked hard, but never achieved good results.  Even in the alternative environment of a BOCES classroom, Nick continued to struggle.  During the school year, he chose to disenroll himself from

the program and dropped out.  During this same period, Nick started dating his future first wife, Amanda Turnquist.  Amanda was older than Nick.  Patti Turnquist did not approve of their relationship, yet Nick and Amanda continued to date.

After dropping out of school, Nick got involved in blue-collar jobs to support himself.  He has always had a strong work ethic and, at this time, his work ethic was no different.  Amanda and Nick eventually moved in together.  As their relationship progressed, so too, did Nick's relationship with Amanda's daughter, Miranda.  Miranda's biological father was notoriously unreliable, so Nick stepped into the role of her father.  He supported her financially.  He helped put a roof over her head, food in her belly, and clothes on her back.  He was the father that her biological father was not.  And he served as her dad since Miranda was three-years old.

Nick and Amanda eventually had children of their own, Rylie and Madison.  After the birth of their daughters, Nick and Amanda made their union formal in 2013.  The blended family lived together in homes they rented or owned.  They also lived with Patti Turnquist for a period.  Nick supported his family by working construction, as a Corrections Officer, and as an entrepreneur.  Amanda also supported the family working at a Country Club.  Things were going alright until 2015 when Nick and Amanda separated.  At the time of their separation, Miranda was a teenager.  She and her mother did not get along very well, so Miranda chose to move in with Nick.  Nick and Amanda split custody of Rylie and Madison.  They divorced in 2017.

In 2018, Nick married his current spouse, Carly Turnquist.  Carly had two children of her own before Nick and she wed.  Her son and daughter grew close to Nick as he fulfilled a father figure role for the children.  Carly and her children continue to love Nick to this day.

**B.      What led to Nicolas Turnquist's arrest and conviction?**

In 2010 when Nick and Amanda were living together with Amanda's daughter,

Miranda was the victim of a horrible accident.  While outside in the front yard of their house,

Miranda was struck by a vehicle.  Miranda suffered serious injuries and had to rehabilitate for several

months.  During this same period, Nick was absent from work due to his own health difficulties.

The family rallied around Miranda and Nick helped Miranda rehabilitate.  At the same time, Nick

took an interest in Miranda sexually.  As Miranda reported to the police, Nick began to periodically

have sexual intercourse with Miranda at this time.  The abuse continued throughout her teenage

years.  The sexual activity would take place in New York, but also outside of the state when Nick

would take Miranda (and sometimes other family members) on trips.  Sometimes these trips were to

indoor waterparks.  Sometimes the trips were to Canada.  Sometimes the trips were to Disney

World.  During these trips, Miranda described to the police how Nick would assault her when family

members were asleep or were not present.

This secret endured for many years notwithstanding some disclosures made by

Miranda to her mother and others.  Despite some lingering suspicions, at times law enforcement –

even Amanda – harbored doubts about the abuse.  This all changed in 2020.  In February 2020,

Miranda sat down with detectives in East Aurora and made a detailed statement accusing Nick of

sexually assaulting her on multiple occasions since she was twelve years old.  Detectives conducted a

controlled call and recorded Nick making admissions about sex with Miranda.  And as law

enforcement continued its investigation by interviewing witnesses and reviewing cell phone data,

evidence mounted.

This revelation was difficult for everyone.  For Nick, it resurrected a chapter of his

life that he would have rather erased.  The misconduct he committed was so unsettling, it

undermined his name, his reputation, and all of the hard-work he put in as a father.  His misconduct destroyed lives and altered all of his relationships.

In 2021, Nick went to trial on charges brought in Wyoming County, NY.  His attorneys identified a legal defect in the case that ultimately led to dismissal.  The same defect was not present in his federal prosecution.  Rather than litigate this case on the merits, Nick chose to spare everyone, including Miranda, the spectacle of a difficult trial.  He pleaded guilty to transporting Miranda across state lines for the purpose of sexual activity.  As part of a global resolution to all cases, the government and Nick agreed to recommend a punishment of thirteen years in prison in his federal case and concurrent sentences in his two remaining state cases.  This spared Miranda and others from the trauma of three additional trials.

C. **This case is classified as one of intra-familial sexual abuse involving a female child.  And there is no evidence that Nicholas Turnquist assaulted or attempted to assault any other person other than Miranda.**

Child sex abuse cases are classified as intra-familial (i.e., "incest" cases) and extra-familial (i.e., "stranger" cases).  This case is defined by intra-familial abuse.  To be certain, Miranda was not Nick's biological daughter, but she was as close to a blood-relative as a child can get.  Nick helped raise Miranda since she was three-years old.  He provided for her just like a biological father (and more than her real biological father).  Nick and Miranda shared as close a bond as Nick does with Rylie and Madison.

This distinction is important because it helps bring the type of abuse and Nick's likelihood of reoffending into proper context.  For example, according to the Office for Justice Programs' Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Office, research into intra-familial and extra-familial offenders reveals the following about intra-familial offenders like Nicholas Turnquist:

Within this typology, child sexual abusers are also categorized based on their relationship to the victim (i.e., intrafamilial or extrafamilial). According to Rice and Harris (2002), intrafamilial child sexual abusers (i.e., incest offenders) are less psychopathic, less likely to report male victims, cause less injury, are less likely to exhibit pedophilia and have lower sexual and violent recidivism rates. Intrafamilial child sexual abusers are less likely to have antisocial tendencies (e.g., criminal history, substance abuse) and atypical sexual interests (Seto, Babchishin, Pullman & McPhail, 2015). Seto et al. (2015) also found intrafamilial offenders display fewer offense-supportive beliefs and interpersonal deficits than extrafamilial child sexual abusers. Extrafamilial child sexual abusers are more likely to be diagnosed with pedophilia (Seto et al., 2015) and are often unable to maintain adult relationships (Prentky et al., 1989). Although intrafamilial child sexual abusers substitute a child for an adult sexual partner, they often maintain their adult sexual relationships (Miner & Dwyer, 1997). Studies have reported that intrafamilial child sexual abusers have fewer victims as compared to extrafamilial sexual offenders (Miner & Dwyer, 1997) and lower rates of sexual recidivism (Stephens et al., 2016). These studies relied primarily on official records (i.e., criminal convictions), which do not take into account the possibility that many incest offenders may have undisclosed victims to whom they are not related. Nonetheless, the gender/relationship typology is the most frequently used and researched typology of child sexual abusers.

*See* Dominique A. Simons, Chapter 3: Sex Offender Typologies, Sex Offender Management Assessment and Planning Initiative, available at: https://smart.ojp.gov/somapi/chapter-3-sex-offender-typologies (last accessed 10/4/2022).

Here, Nicholas Turnquist has no criminal or substance abuse history.  He maintained a relationship and sexual interest with Amanda Turnquist and others during the period of abuse.  He also does not display signs of sexual attraction to minor females other than his step-daughter (who was a teenager during a majority of the period of abuse).  This profile typology is consistent with the research of an intra-familial offender.

In addition, there is no evidence that Nicholas Turnquist engaged in this type of misconduct with any other minor, whether male or female, within his family or outside of it.[1]  When Miranda disclosed the abuse, law enforcement interviewed Rylie and Madison.  Law enforcement conducted an extensive review of electronic evidence as well.  Nothing in the investigation revealed any abuse of another minor or evidence that Nick possessed child pornography or other instrumentalities/indicators of child sexual abuse or pedophilia.  This makes this case a single-victim, intra-familial case.  And that is important because the research shows that such offenders have lower rates of re-offense and, as a whole, are less dangerous and more capable of rehabilitation.  *See id.*

### D.  Why a sentence in excess of the recommended sentence of thirteen years' incarceration is unnecessary and excessive.

The parties entered an agreement pursuant to Rule 11(c)(1)(C) that a proper sentence of incarceration in this case is thirteen years.  This term is within the recommended guideline range and the Court should accept the agreement for several reasons: Closure.  Acceptance of Responsibility & Remorse.  Offense Typology.  Lack of a criminal history.  Amenability to treatment.  Family support.  All of these factors demonstrate that a sentence in excess of the recommended sentence of *thirteen years* – already, an exceedingly severe penalty – is not necessary

---

[1] The defense is cognizant that the PSR recounts an allegation from another minor, J.C., who was a relative of Mr. Turnquist.  *See* PSR at ¶34.  This unproven allegation does not affect the analysis whatsoever.  First, to the extent J.C.'s allegations are deemed credible, none of J.C.'s allegations involve physical sexual abuse analogous to the abuse suffered by Miranda.  Second, as the defense set forth in its pretrial filings, J.C.'s allegations suffer from serious credibility concerns.  J.C. has a significant motive to fabricate, has an untruthful character, suffers from mental health difficulties, and engages in substance abuse.  On top of that, text messages recovered between J.C. and Mr. Turnquist prove that J.C. propositioned Mr. Turnquist on at least two occasions and, on both occasions, Mr. Turnquist rebuffed J.C.'s sexual advances.  Mr. Turnquist does not raise this point to levy an objection to the inclusion of J.C.'s allegations in the PSR – the defense has abstained from doing so because the Rule 11(c)(1)(C) agreement likely makes resolution of this dispute moot pursuant to Rule 32(i)(3)(B) as J.C.'s unproven allegations presumably will not affect this Court's determination of a proper sentence in this case or not be considered.  However, the defense raises this point to show that 1) Mr. Turnquist's behavior is consistent with a person who can properly control himself and 2) Mr. Turnquist is a single-victim, intra-familial offender.

because this misconduct is isolated and the empirical evidence suggests that Nick will not commit this type of misconduct in the future.

*Closure.*  Sexual offense cases are always difficult.  Intra-familial cases are even more difficult.  As this Court saw during the pretrial phase of this case, litigation is intense.  The litigation and the allegations force families apart.  Relationships and support mechanism are destroyed.  The victim of the offense suffers hardship.  On the eve of trial, Mr. Turnquist chose to end some of their despair by instructing his counsel to seek a plea that struck a balance between punishment and rehabilitation.  The defense and the prosecution engaged in extensive discussions to strike this balance.  After consulting each other, the family, the defendant, and the victim, the parties collectively agreed that among other punishments, a term of thirteen years in prison was an acceptable punishment to resolve this case and, by extension, albeit informally, open cases in two other state jurisdictions (both cases were awaiting trials that would prove to be as difficult and intensely litigated as the federal case).  If the Court accepts the Rule 11(c)(1)(C) agreement, three cases will be resolved in full without the need for costly trials.  Closure is an appropriate reason to approve the plea agreement in this case.

*Acceptance of Responsibility & Remorse.*  On July 6, 2022, Mr. Turnquist pleaded guilty before this Court.  His admissions of responsibility were difficult to make in a public setting, but it was something that Mr. Turnquist did nonetheless to atone for his misconduct.  Mr. Turnquist intends to speak to the Court at sentencing about his conduct in this case.  However, the Court has already witnessed the remorse he feels.  Whether it was admitting to Amber Talarico that there were things between he and Miranda that he would "take to his grave" or to his own wife Carly:



From: +17169821641 My Love
(owner)
Over think it and what I tell I is the truth and i hate my self and so much shit

From: +17169821641 My Love
(owner)
I want to kill my self all the time cuz of it I am a scum bag

These expressions are sincere and telling. They demonstrate the remorse Mr. Turnquist has

regarding his actions. This is an important indicator of acceptance of responsibility. It is another

reason the Court should honor the recommendation in the plea agreement.

       *Offense Typology.* As discuss above in Section C, *supra*, Mr. Turnquist is a single-victim,

intra-familial offender. This incest-type offense – and the empirical research behind it –

demonstrate that, upon his release, Mr. Turnquist is less likely to reoffend. Consequently, the

research supports the sentence agreed to by the parties because incapacitation of Mr. Turnquist for a

longer period in prison is less necessary to further the goal of protection. Stated another way, the

research proves that Mr. Turnquist is less likely to assault extra-familial children, making protection

of that particular victim-class less necessary. And as for the minor children in his family – who

arguably are the more likely targets of any future abuse – the agreed upon sentence will incarcerate

Mr. Turnquist until his biological daughters are adults and Carly's biological daughter is an adult,

rendering the possibility of victimization of another familial-female impossible. This is why the

thirteen-year sentence in the plea agreement provides sufficient incapacity to protect society.

       *Lack of criminal history.* This is Mr. Turnquist's first and only criminal conviction. He

has not been the subject of other arrests and prosecutions. By all measures, outside of this incident,

Mr. Turnquist's ability to conform his conduct to the law is present. And while this incident is

extraordinarily significant (this fact is indisputable), Mr. Turnquist has displayed several traits that are

inconsistent with anti-social conduct. He maintains employment. He volunteers in the community.

He supports his family. These traits are indicative of a person who is (and can be) a law-abiding

citizen. This makes further incapacity unnecessary and is another reason to approve the agreement.

*Amenability to treatment.*  Willingness to change, undergo treatment, and pursue education also is indicative of the need for a lesser term of incarceration.  Treatment and education also are an important step in the rehabilitation process.  The Bureau of Prisons has an intense Sexual Offender Treatment Program that Mr. Turnquist can participate in while he is incarcerated and complete prior to his release.  Completion of this program will assist Mr. Turnquist with controlling his behavior post-release.  On top of that, Mr. Turnquist has indicated to his loved ones that he wants to pursue education and other programs while he is incarcerated to better himself and prepare him for his release.  According to social science research, pursuing education while in custody is an important component to reducing recidivism:

**Summary**

When examining 71 effect size estimates from 50 studies of correctional education programs spanning 32 years of research with analyses ranging in methodological quality and rigor, the majority of studies we identified showed lower rates of recidivism among inmates receiving correctional education than among inmates who did not receive correctional education. To provide the best estimate of the causal relationship between correctional education and recidivism, we examined nine effect size estimates from seven studies that received a Level 4 or Level 5 rating on the Maryland SMS (i.e., the most rigorous research designs) and found that the odds of recidivating among treatment group members are 43 percent lower than the odds of recidivating among comparison group members. When applying these estimated odds to the most recently reported national rates of reincarceration (43.3 percent within three years of release), correctional education would reduce reincarceration rates by 12.9 percentage points on average, although effectiveness does appear to differ by program.

*See* Lois M. Davis, Robert Bozick, Jennifer L. Steele, Jessica Saunders, Jeremy N. V. Miles, *Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs That Provide Education to Incarcerated Adults* (2013), available at:

https://www.rand.org/content/dam/rand/pubs/research_reports/RR200/RR266/RAND_RR266.sum.pdf (last accessed 3/22/2019).  This is another reason why thirteen years is an appropriate term of incarceration in this case.

*Family Support.*  Mr. Turnquist also enjoys strong support from his family.  His wife misses him.  His children miss him.  His brother and parents miss him.  All have indicated to this writer that they intend to support Mr. Turnquist while he is incarcerated *and* after he is released.  His

mother wants to visit.  His brother wants to offer assistance with employment.  His wife wants to move to where Mr. Turnquist is confined so that she can visit with him frequently and maintain family bonds.  Family support is critical to successful rehabilitation. Studies show that prison inmates who have more contact with their families and who reported positive relationships overall are less likely to be re-incarcerated.  *See* Martinez, D. J. & Christian, J., *The familial relationships of former prisoners: Examining the link between residence and informal support mechanisms,* 38 J. OF CONTEMPORARY ETHNOGRAPHY 201–224 (2009).  This is because family members provide social control and social support (which inhibit criminal activity).  *See* SAMPSON R.J. & J.H. LAUB, CRIME IN THE MAKING: PATHWAYS AND TURNING POINTS THROUGH LIFE (Harvard University Press 1993); Cullen, F.T., J.P. Wright & M.B. Chamlin, *Social support and social reform: A progressive crime control agenda.* 45 CRIME & DELINQUENCY 188-207 (1999); MARUNA, S., R. IMMARIGEON & T.P. LEBEL, EX-OFFENDER REINTEGRATION: THEORY AND PRACTICE 326 (2006), *reprinted in* AFTER CRIME AND PUNISHMENT: PATHWAYS TO OFFENDER REINTEGRATION (Willan Publishing 2004).  Family members also facilitate informal social controls that link ex-inmates to churches, law-abiding neighbors, housing, employment, and education and training opportunities that they may not be successful in obtaining on their own.  *See generally* PETERSILIA, J., WHEN PRISONERS COME HOME: PAROLE AND PRISONER REENTRY (Oxford University Press 2003); TRAVIS, J., A. SOLOMON & M. WAUL,  FROM PRISON TO HOME: THE DIMENSION AND CONSEQUENCES OF PRISONER REENTRY (The Urban Institute 2001). Ex-inmates lacking positive supportive relationships with family are more likely to recidivate.  *See id.* The love and support Mr. Turnquist enjoys from his family members makes long-term incapacitation unnecessary.

*          *          *

As set forth above, Nicholas Turnquist is a defendant who engaged in indefensible conduct with his step-daughter when she was a minor.  However, he also is a person who has not

had trouble with stable, positive relationships with other women, both children and adults, throughout his life. He is a person who has strong family support. He has a strong work ethic. He is someone who has demonstrated a willingness to better himself and accept responsibility for the misconduct that led to his conviction. He recognizes what he did and why it is wrong. All of these things make long-term incapaciation unnecessary. Simply put, he is less of a recidivism risk than other child sex offenders. That is why the Court is justified in imposing the thirteen-year sentence of incarceration agreed to by the parties.

### E. What is a proper sentence in this case.

First, the Court should award Mr. Turnquist full credit for acceptance of responsibility pursuant to USSG 3E1.1(a) and (b). He has proven his willingness to atone for his criminality. His statements to and actions before investigators, the probation office, and the Court are consistent with acceptance of responsibility. The Court should adopt the recommendation of the Probation Department in the PSR and reduce his guidelines calculation accordingly.

Second, the Court should not impose a fine in this case or the $5,000.00 special assessment provided for in 18 U.S.C. § 3013. Mr. Turnquist is not in a position to pay a fine or the special assessment. He has no savings anymore. All of his assets are liquidated or depleted. Mr. Turnquist has been incarcerated and out of work for over two years. This is why the PSR determined that he was indigent and did not have the ability to pay a fine. *See* PSR at ¶¶110-14. If the Court imposed a fine or the special assessment in this case, Mr. Turnquist would, upon his release from prison, find himself behind a financial eight ball that will interfere with his successful rehabilitation. Such a penalty is overly punitive, onerous, unfair, and defeats realization of the main goal in this case for all parties: rehabilitation and reintegration into society.

Third, the Court should agree to the thirteen-year term of incarceration recommended in the plea agreement. *Thirteen years of confinement* is a sentence that certainly promotes

respect for the law, provides just punishment for the offense, and is within the range of punishment accorded to a serious felony.  As set forth above, this sentence realizes the goals of punishment, incapacitation, and protection of society.  It also is sufficient in length to provide for specific and general deterrence.  Finally, the sentence provides an opportunity for Mr. Turnquist to rehabilitate from this conviction and return to being a law-abiding citizen.  Adjudging the penalty recommended by the parties recognizes the specific circumstances of this case as well as the unique history and characteristics of Mr. Turnquist.  That is why such a term is sufficient, but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2).

Finally, the Court should impose a period of supervised release of ten years.  Per statute, the term must be no less than five years.  *See* 18 USC § 3583(k).  Under the guidelines, the suggested term in this case is five years to life.  *See* PSR at ¶80.  Mr. Turnquist suggests that a term of ten years is appropriate.  If the Court imposes a thirteen-year sentence, Mr. Turnquist will be released from prison when he is approximately 45 years old.  Imposition of a ten-year period of supervisions will ensure that Mr. Turnquist is monitored and tracked until he is 55 years old.  This is a significant and sufficient period of supervision.

First, research dedicated to sexual offender recidivism has repeatedly shown that as offenders age their risk of recidivism decreases.  *See, e.g.,* Hanson, R. K., *Recidivism and age: Follow-up data from 4,673 sexual offenders,* 17 J. OF INTERPERSONAL VIOLENCE 1046-1062 (2002); Thornton, D., *Age and Sexual recidivism: A variable connection*, 18 SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT 123-135 (2006).  Second, not only does a person's sex drive decline with age (which would make it less likely for re-offending in a sexually-based context), but research into general recidivism rates conducted by the U.S. Sentencing Commission reveals that as an offender gets older, he is less likely to recidivate upon his release from jail.  *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017), available at:

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last accessed 8/18/2022). This assumption applies to rearrests, reconviction, and reincarceration. *See id.* at 22-23. At 45 years old, Nicholas Turnquist statistically is less likely to recidivate. At 55 years old, Mr. Turnquist is even less likely to recidivate. Simply put, he poses less of a risk to society at 55 years old than when he was younger, during the period of abuse and at the time of his arrest.



Imposing a ten-year term of supervision will ensure that Mr. Turnquist is supervised until he reaches that milestone. When supervision is combined with sex offender registration, both mechanisms will ensure supervision and control of Mr. Turnquist's post-release activities and provide a means to penalize Mr. Turnquist if he deviates from his conditions. This will, in turn, ensure community safety and awareness while, at the same time, not extending the expense of supervision into a period of time when the risk of recidivism is appreciably lower and, given the unique facts of this case, the necessity of extended supervision is unnecessary since Mr. Turnquist's likely victim-class are all adults.

**Conclusion**

For the reasons set forth above, this Court should impose a sentence of confinement of 156 months (13 years); no fine or special assessment; a mandatory assessment of $100.00; and, a term of supervised release of ten (10) years.  In addition, the Court should recommend to the Bureau of Prisons that Mr. Turnquist be transferred to Federal Correctional Institution Elkton in Illinois because FCI Elkton is close to Mr. Turnquist's family, offers the SOTP program, and offers various educational and vocational learning programs that Mr. Turnquist desires to pursue while he is incarcerated.  Placing Mr. Turnquist in this facility will assist Mr. Turnquist with rehabilitating himself and will help ensure his qualification for a legitimate job upon release from custody.  And keeping him at a location closer to family and limiting the time he is in confinement will help ensure that Mr. Turnquist maintains a connection with his family members and continues on the path toward recovery.

Dated:   October 7, 2022
         Williamsville, NY

                                        **SINGER LEGAL PLLC**
                                        *Attorneys for Defendant Nicholas Turnquist*

                                        By:____s/ Robert C. Singer, Esq._____
                                               Robert C. Singer, Esq.
                                               80 East Spring Street
                                               Williamsville, New York  14221
                                               (716) 222-3288
                                               rob@singerlegalpllc.com